# United States Court of Appeals for the Federal Circuit

---

**SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER, SCOTT ADOLPHSON, MORRIS J. PENDLETON, BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR, AUTUMN WEAVER, ARIES BLUESTONE WEAVER, ELIJAH BLUESTONE WEAVER, RUBY MINKEL, LAVONNE A. SWENSON, WILLIS SWENSON, AARON SWENSON, BEVERLY M. SCOTT, LILLIAN WILSON, MONIQUE WILSON, SANDRA COLUMBUS GESHICK, CHERYL K. LORUSSO, JENNIFER K. LORUSSO, CASSANDRA SHEVCHUK, JASON SHEVCHUK, JAMES PAUL WILSON, EVA GRACE WILSON, BENITA M. JOHNSON, AND KEVIN LORUSSO**,
*Plaintiffs-Cross Appellants,*

AND

**ANITA D. WHIPPLE et al., Descendants of Lucy Trudell, BONNIE RAE LOWE, et al., Descendants of Joseph Graham, et al., LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose, AND MARY BETH LAFFERTY, et al.,**
*Plaintiffs,*

AND

**COURSOLLE DESCENDANTS AND ROCQUE AND TAYLOR DESCENDANTS,**
*Plaintiffs,*

AND

**DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al., DANIEL M TRUDELL, et al., ROBERT LEE TAYLOR, et al., AND DAWN HENRY,**
*Plaintiffs,*

AND

**RAYMOND CERMAK, SR., (acting individually and under a power of attorney for Stanley F. Cermak, Sr.), MICHAEL STEPHENS, et al., JESSE CERMAK, et al., DENISE HENDERSON, DELORES KLINGBERG, SALLY ELLA ALKIRE, PIERRE ARNOLD, JR., AND GETRUDE GODOY et al.,**
*Plaintiffs,*

AND

**JOHN DOES 1-30, WINONA C. THOMAS ENYARD, AND KITTO, et al.,**
*Plaintiffs,*

AND

**FRANCINE GARREAU, et al.,**
*Plaintiffs,*

AND

**FRANCIS ELAINE FELIX,**
*Plaintiff,*

AND

**KE ZEPHIER, et al.,**
*Plaintiffs,*

AND

**LOWER SIOUX INDIAN COMMUNITY,**
*Plaintiff,*

AND

**PHILIP W. MORGAN**,
*Plaintiff,*

AND

**REBECCA ELIZABETH FELIX**,
*Plaintiff,*

AND

**VERA A. ROONEY, et al.,**
*Plaintiffs,*

AND

**DANNY LEE MOZAK,**
*Plaintiff-Cross Appellant,*

AND

**DAWN BURLEY, et al.**
*Plaintiffs-Cross Appellants,*

AND

**HARLEY ZEPHIER, SR.,**
*Plaintiff-Cross Appellant,*

AND

**JOHN DOES 1-433,**
*Plaintiffs-Cross Appellants,*

**AND**

**JULIA DUMARCE, et al.,**
*Plaintiffs-Cross Appellants,*

**AND**

**RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al., SANDRA KIMBELL, et al., CHARLENE WANNA, et al., AND LESLIE LEE FRENCH, et al.,**
*Plaintiffs-Cross Appellants,*

**AND**

**KRISTINE ABRAHAMSON,**
*Plaintiff-Cross-Appellant,*

**AND**

**VICTORIA ROBERTSON VADNAIS,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

———————————

2012-5035, -5036, -5043

———————————

Appeals from the United States Court of Federal Claims in case Nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow.

————————————

Decided: September 27, 2013

————————————

ERICK G. KAARDAL, Mohrman & Kaardal, P.A., of Minneapolis, Minnesota, argued for plaintiffs-cross appellants, Sheldon Peters Wolfchild, et al.

GARY J. MONTANA, Montana & Associates, of Osseo, Wisconsin, argued for plaintiffs-cross appellants, Julia Dumarce Group, et al. and ROBIN L. ZEPHIER, Abourezek & Zephier, of Rapid City, South Dakota, argued for Plaintiff-Cross Appellant, Harley Zephier, Sr. With them on the brief was R. DERYL EDWARDS, JR., Attorney at Law, of Joplin, Missouri.

JOHN L. SMELTZER, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were IGNACIA S. MORENO, Assistant Attorney General, AARON AVILA and JODY SCHWARZ, Attorneys.

PHILIP BAKER-SHENK, Holland & Knight, LLP, of Washington, DC, for amici curiae.

————————————

Before RADER, *Chief Judge,* REYNA, and TARANTO, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* TARANTO.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* REYNA.

TARANTO, *Circuit Judge.*

The United States currently holds certain tracts of land in Minnesota in trust for three Indian communities. It originally acquired some of that land in the late 1800s, using funds appropriated by Congress to help support a statutorily identified group of Indians, and held it for the benefit of those Indians and their descendants for decades. As time passed, that beneficiary group and the three present-day communities that grew on these lands overlapped but diverged: many of the beneficiary group were part of the communities, but many were not; and the communities included many outside the beneficiary group. In 1980, Congress addressed the resulting land-use problems by putting the lands into trust for the three communities that had long occupied them. Ever since, proceeds earned from the lands—including profits from gaming—have gone to the same three communities.

The discrepancy between the makeup of the three communities and the collection of descendants of the Indians designated in the original appropriations acts underlies the present dispute, which was before this court once before. Claimants allege that they belong to the latter group and that they, rather than the communities, hold rights to the land at issue and any money generated from it. Four years ago, based on an extensive analysis of the relevant laws and history, we rejected what was then the only live claim, which got to the heart of their assertion: that the appropriations acts created a trust for the benefit of the statutorily designated Indians and their descendants. *Wolfchild v. United States,* 559 F.3d 1228

(Fed. Cir. 2009). On remand, claimants advanced several new claims, some of which seek proceeds generated from the lands, others of which seek more. Again unable to find that claimants have stated a claim that meets the standards of governing law, we now reject these new claims, including the one that the Court of Federal Claims held valid in the judgment we review.

BACKGROUND

A

The Minnesota Sioux originally lived along a northern stretch of the Mississippi River. But in the middle of the nineteenth century, including in treaties of 1851 and 1858, the group ceded its aboriginal land to the United States. In return for territory and promises of peace, the Sioux received a reservation along the Minnesota River (a tributary of the Mississippi) and assurances of compensation.

This arrangement was short-lived. By 1862, many of the Sioux, whose grievances we need not detail, rebelled. The United States defeated the uprising, but not before many non-Indian settlers had been killed and their property damaged.

Congress responded to the rebellion with two statutes in early 1863. The first annulled all treaties with the Sioux and declared that much of the money still owing to the Indians would be paid to non-Indian Minnesota families harmed during the conflict. Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. The second, passed the following month, focused on moving the rebellious Sioux out of Minnesota and redistributing their former reservation land. Act of Mar. 3, 1863, ch. 119, 12 Stat. 819.

Both statutes, however, also recognized that some individual Sioux had remained loyal to the United States during the revolt and were now left without benefits under the annulled treaties and without the tribal affilia-

tion they had broken by siding with the United States. The February Act, therefore, authorized the Secretary of the Interior to "set apart . . . eighty acres in severalty to each individual . . . who exerted himself in rescuing the whites" and provided that any land "so set apart . . . shall be an inheritance to said Indians and their heirs forever." Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The March Act similarly allowed the Secretary to locate any of the same "meritorious individual Indian[s]" on certain former reservation lands, "to be held by such tenure as is or may be provided by law." Act of Mar. 3, 1863, § 4, 12 Stat. at 819.

Two years later, in 1865, the United States took additional steps to try to help the loyal Sioux. First, Congress appropriated $7,500 to "make . . . provision[s] for their welfare" because they were "entirely destitute." Act of Feb. 9, 1865, ch. 29, 13 Stat. 427. Shortly thereafter, the Secretary of the Interior approved the withdrawal from public sale of 12 sections of land (12 square miles, or 7,680 acres), invoking the land-allocating authority of the two 1863 Acts. But opposition from local residents developed, leading officials to abandon this effort to secure a more permanent settlement for the loyal Sioux. The 12 parcels were returned to public sale and sold.

Congress took no further action to assist the loyal Sioux until the 1880s. By that time, many of them had moved out of Minnesota, but a small number of Mdewakantons—the name of one of the bands of Minnesota Sioux—had remained in or returned to the state. Beginning in 1884, Congress appropriated funds that Interior paid directly to these Mdewakantons or used to buy land that was then transferred to them in fee. Many Mdewakantons failed to hold onto clean title in their land, however, and the federal government soon changed its approach.

In 1888, 1889, and 1890, Congress passed three statutes appropriating a total of $40,000 to support the Mdewakantons who had resided in (or been moving to) Minnesota on May 20, 1886 and had "severed their tribal relations." Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349. The Acts authorized the Secretary to spend the funds on a number of items, including lands, cattle, horses, and agricultural implements. *Id.* With some of the money, the government purchased land in four Minnesota counties—Scott, Redwood, Goodhue, and Wabasha. This time, rather than transfer ownership rights directly to the Indians, the United States retained title in the land and assigned only rights of possession and use.

During the decades that followed, communities formed on the land in three of the four counties. Unsurprisingly, the communities consisted largely of Indians who had descended from the Mdewakantons identified in the 1888-1890 Acts and for whose benefit lands were purchased under those Acts. But the overlap between the communities and the class of statutory beneficiaries was not perfect: the communities included some people who were not descendants of these Mdewakantons, and not all of the descendants of these Mdweakantons were members of the three communities.

The 1934 enactment of the Indian Reorganization Act (IRA) had two significant consequences for the three communities. First, the Act granted Indians a right to "organize for [their] common welfare." Act of June 18, 1934, ch. 576, § 16, 48 Stat. 984, 987. The Secretary permitted the Minnesota communities to organize as the Prairie Island Indian Community (on the land in Goodhue County), the Shakopee Mdewakanton Sioux Community (in Scott County), and the Lower Sioux Indian Community (in Redwood County). Second, the Act authorized the Secretary to purchase land for Indians and provided that

title to any such land would be "taken in the name of the United States in trust" for the beneficiaries. *Id.* § 5, 48 Stat. at 985. After 1934, the government acquired additional territory for the Prairie Island and Lower Sioux communities under this statute and held those lands in trust for those two communities.

The three communities encountered difficulties in managing the land they occupied. A significant reason was that, while some of the land was held under the IRA for the communities as a whole, much of the land was held for the use and benefit of certain Mdewakantons, rather than the communities. In 1980, Congress set out to resolve the problem by declaring that "all right, title, and interest of the United States" in the land acquired under the 1888-1890 appropriations acts would "hereafter be held by the United States . . . in trust" for the three communities. Act of Dec. 19, 1980, Pub. L. No. 96-557, 94 Stat. 3262. That enactment equalized the status of the land acquired under the IRA and the land purchased under the 1888-1890 Acts: all the land was now held in trust for the benefit of those communities.

B

The varying rights to the land acquired in the aftermath of the 1862 rebellion have had significant consequences for the distribution of money related to that land. Over the years, the land has produced revenue in different ways. In 1944, for example, Congress generated $1,261.20 when it authorized the transfer to a wildlife refuge of land "no longer used by Indians" in Wabasha County—one of the four counties in which land was purchased under the 1888-1890 Acts. Act of June 13, 1944, Pub. L. No. 78-335, §§ 1-2, 58 Stat. 274. Later, but still before 1980, the Department of the Interior leased or licensed land bought under the 1888-1890 Acts when no eligible Mdewakanton was available for assignment, and it then either passed the proceeds to third parties or held

them in accounts at the Treasury Department. After 1980, the introduction of casino gambling on the land generated substantial profits.

To date, the three communities and their members have received all of this money. In 1981 and 1982, Interior disbursed to the three communities funds derived from the Wabasha County land transfer and from the leasing of unused lands—amounting to $61,725.22 in 1975, over $130,000 at the time of disbursement, and about $675,000 today. The extensive gaming profits earned from casinos and other businesses have likewise gone to members of the communities for whom the lands are currently held in trust.

This lawsuit began as—and to a large extent continues to be—a dispute about those revenues. In 2003, a group claiming to be descendants of the Mdewakantons who were eligible for benefits under the 1888-1890 Acts brought suit against the government. The principal theory asserted was that the 1888-1890 Acts created a trust for their benefit and that the government had breached that trust by allowing proceeds from the lands purchased under those Acts to go to the three communities. In 2009, in an interlocutory appeal, we rejected that argument, holding that the 1888-1890 Acts did not create a trust for the statutorily designated beneficiaries or their descendants and that, even if there was such a trust, it was terminated by the 1980 Act. *Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009).

On remand, several groups of claimants filed motions to amend their complaints to add a number of claims not previously asserted. They continued to pursue revenues derived from the land (now under new theories), and they also sought to add claims based on the government's alleged failure to provide them with more land in the 1800s. Claimants rooted their proposed causes of action in a variety of authorities, including the 1863 Acts, the

1888-1890 Acts, the Indian Non-Intercourse Act, and the Takings Clause of the Fifth Amendment.

The Court of Federal Claims addressed the motions to amend in two decisions. The first decision granted claimants leave to add one count, concerning the 1888-1890 Acts, and ruled favorably on that claim in part: it found the government liable on a claim to pre-1980 revenues from the lands acquired under the 1888-1890 Acts, but rejected any claim to funds generated from the lands after the passage of the 1980 Act. *Wolfchild v. United States*, 96 Fed. Cl. 302 (2010). The next year, the Claims Court denied claimants' motions to add claims under the Indian Non-Intercourse Act, the 1863 Acts, and the Takings Clause because the proposed causes of action "would not withstand a motion to dismiss." *Wolfchild v. United States*, 101 Fed. Cl. 54, 76 (2011). The court also established a process for distribution of damages awarded in the judgment concerning the pre-1980 revenues from land bought under the 1888-1890 Acts. *Id.* at 86-92.

The parties have filed three separate appeals from those decisions. The government seeks reversal of the judgment regarding pre-1980 revenues (and challenges the distribution process), and two plaintiff groups challenge the rejection of various other claims they sought to add to their complaints. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

A

1

The first appeal before us, brought by the government, concerns claimants' alleged right to pre-1980 revenues generated from the lands purchased under the 1888-1890 Acts. The question is whether the Acts create a "money-mandating" duty that extends to the claim made by these claimants, *i.e.*, applies to proceeds earned from

land bought with the original appropriations and requires that such proceeds, if and when they accrue, be paid to descendants of the original beneficiaries identified in the statutes more than a century ago. We conclude that the 1888-1890 Acts do not impose such a money-mandating duty, which presents a question of law, *Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007), and we therefore reverse the Claims Court's judgment against the United States.

A viable claim under the Indian Tucker Act, 28 U.S.C. § 1505, requires that the plaintiffs "'identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (*Navajo II*). The court then must decide whether the identified source of law "'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties . . . impose[d].'" *Id.* at 291. Implicit in these requirements is the logical premise that the asserted source of a duty must apply to the particular plaintiffs' claim: plaintiffs "cannot invoke [a statute] as a source of money-mandating rights or duties" if the basis for *their* complaint "'falls outside' [the statute's] domain.'" *Id.* at 299-300; *see United States v. Navajo Nation*, 537 U.S. 488, 509 (2003) (*Navajo I*) (rejecting reliance on a statute that "does not establish standards governing" the particular type of conduct at issue); *id.* at 513 (assertions "are not grounded in a specific statutory . . . provision that can fairly be interpreted as mandating money damages" if the provisions invoked do not "proscribe[] the [conduct] in th[at] case"). As this court has held, "[t]he statute must . . . be money-mandating as to the particular class of plaintiffs." *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 876 n.2 (Fed. Cir. 2007); *see Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1308 (Fed. Cir. 2008).

Those prerequisites control this appeal because, even if the 1888-1890 Acts were money-mandating as to some benefits for some people (say, the original appropriation for the original designated Indians), the claimants that are now here have not identified a money-mandating duty in the 1888-1890 Acts requiring that proceeds from certain lands be distributed to them as descendants of the designated Indians. To begin with, the text of the Acts contains no "specific rights-creating or duty-imposing statutory . . . prescriptions" that apply to the present claim and claimants. *Navajo I*, 537 U.S. at 506. On the contrary, any prescriptions in the Acts—indicating, for example, who the beneficiaries are, and that each Indian "shall receive[], as nearly as practicable an equal amount in value of this appropriation," Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 993—do not go beyond requiring that the original Indians designated in the Acts benefit from the expenditure of the money appropriated. The statutes neither mention "descendants" of those designated Indians nor say anything about proceeds that may or may not accrue from what was bought with the appropriated funds. The only express mandates in the Acts, in other words, begin and end with the expenditure of money appropriated in those Acts, for the benefit of the Indians specified in those Acts.

With the statutory text silent about any "specific fiduciary or other duties" concerning future proceeds or descendants, *Navajo II*, 556 U.S. at 290 (internal quotation marks omitted), claimants must be able to show that such a duty is properly inferred from the language. The Claims Court inferred the requisite duty by reasoning that, because the Secretary viewed the 1888-1890 Acts as providing the *authority* to generate leasing revenues for the benefit of descendants of the original Indians, all of the requirements in those Acts necessarily attached to direct the spending of revenues generated under that authority. *See Wolfchild*, 96 Fed. Cl. at 336-37. But that

line of reasoning does not support the required inference of a money-mandating duty applicable here.

The Secretary's authority to act does not support inference of the asserted *duty* to act (enforceable by a suit for money damages). At the threshold, the mere authority to generate leasing revenues does not carry with it any obligation to do so. The Secretary would not have violated any provision of the Acts if he had opted not to generate any leasing (or other) proceeds at all after the initial funds were spent.

That leaves only the argument that, once the government had collected land revenues that never had to be earned in the first place, the Acts imposed a duty that dictated how to spend those revenues—specifically, for descendants. Simply stating the argument, however, makes clear that it is, in substance, a claim that everything bought with the original appropriations, and proceeds from such purchases, were to be held in trust for the Indians and their descendants. Claimants recognized that this was their essential claim when they made just that argument under the 1888-1890 Acts throughout this case's initial stages. But this court rejected that trust claim in 2009, after full analysis of the statutory language, history, and implementation, an analysis we need not repeat here. *Wolfchild*, 559 F.3d 1228. Having reserved the present issue for later analysis "to the extent necessary," *id.* at 1260 n.14, we now conclude that our rejection of the trust claim four years ago—a matter of substance, not labels—requires rejection of what amounts, at bottom, to the same substantive claim here.

Pragmatic considerations reinforce our conclusion. Specifically, adopting claimants' argument would present such substantial practical problems that, in the absence of much clearer language than exists, the statutes cannot fairly be read to impose the money-mandating duty that claimants assert. The funds at issue were first disbursed

nearly 100 years after the original appropriations acts became law, by which time descendants had spread out geographically and numbered in the thousands. The particular Acts at issue applied to Indians that did not constitute an organized tribe or other easily identified and stable beneficiary group. If claimants' view about descendants and proceeds were right, simply sorting out who was owed money, as well as when they were to be paid and how (instructions absent from the statutes), would, by the early 1980s, have imposed a tremendous burden on the Department of the Interior and, then, on any court called on to review Interior's actions.[1] Given the inevitable exacerbation of such difficulties over time, a more explicit direction from Congress is needed to justify inferring not just a grant of discretionary authority but a mandate enforceable in court through damages.

For these reasons, we are persuaded that, for the claim at issue, there is "no warrant from any relevant statute or regulation to conclude that [Interior's] conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act." *Navajo I*, 537 U.S. at 514. That conclusion requires that we reverse the judgment of the Claims Court on this claim.

2

We would reverse in any event on an independent ground: claimants filed this claim too late. Claimants filed this suit in 2003, more than twenty years after the pre-1980 revenues were disbursed to the three communi-

---

[1]    In addition to the revenues that the government held and ultimately paid to the communities, some money earned from leasing was apparently paid directly to third parties. There is no indication that claimants ever objected to this practice, yet their theory would seem to embrace those funds.

ties in 1981 and 1982. The presentation of the claim was out of time under the six-year statute of limitations, 28 U.S.C. § 2501, unless, as the Claims Court concluded, it was rendered timely by the Indian Trust Accounting Statute (ITAS). *See Wolfchild*, 96 Fed. Cl. at 332-35. The ITAS, which has been included in appropriations acts since 1990, provides that "notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." *E.g.*, Pub. L. No. 108-108, 117 Stat. 1241, 1263 (2003). Unlike the Claims Court, however, we conclude for at least two reasons that the ITAS does not apply to this claim—a question of law, *see Gillig v. Nike, Inc.*, 602 F.3d 1354, 1358 (Fed. Cir. 2010).

First, the claim to pre-1980 revenues is not a "claim[] concerning . . . losses to or mismanagement of trust funds." The claim does not involve "trust funds" because no trust duty applied to this money, as we held in 2009. *Wolfchild*, 559 F.3d at 1255. The Claims Court ruled that the funds nevertheless fell within the purview of the ITAS because they were deposited and held in Treasury accounts that were sometimes referred to as "trust" accounts and an Interior regulation, 25 C.F.R. § 115.002, defines "trust funds" to include "any . . . money that the Secretary must accept into trust." *Wolfchild*, 96 Fed. Cl. at 331-35. But "trust funds" under the statute naturally refers to funds subject to certain substantive duties, not to the labels on or handling of Treasury accounts. The funds at issue here were not subject to a trust duty. And the cited regulation undermines, rather than supports, claimants' position, because these were not funds that the Secretary "must" have accepted into trust. This claim does not concern "trust funds."

Second, even if the funds at issue were trust assets, the claim made here would not be the sort of claim for which a final accounting would be necessary to put a plaintiff on notice of a claim, because claimants knew or should have known that the money was publicly distributed in 1981 and 1982. The ITAS says that the statute of limitations does not commence to run for claims "concerning losses to or mismanagement of trust funds" until the beneficiary receives "an accounting . . . from which [it] can determine whether there has been a loss." Consistent with the reason for the enactment, as explained in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1346-48 (Fed. Cir. 2004), the two quoted phrases are properly read together: the claims about "losses" or "mismanagement" that are protected by this provision are those for which an accounting matters in allowing a claimant to identify and prove the harm-causing act at issue; otherwise, the ITAS would give claimants the right to wait for an accounting that they do not need. When a claim concerns an open repudiation of an alleged trust duty, "a 'final accounting' [i]s unnecessary to put the [claimants] on notice of the accrual of [their] claim." *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1355 (Fed. Cir. 2011) (relying on *Shoshone*). That description fits this case: claimants did not need an accounting in order to "determine whether there ha[d] been a loss" because the funds at issue were openly disbursed in 1981 and 1982. For that reason as well, the ITAS does not save this claim from untimeliness.

## B

The two cross-appeals, filed by claimants, concern a series of proposed claims principally asserted under (1) the 1863 Acts, (2) the 1851 and 1858 treaties, and (3) the Indian Non-Intercourse Act. We affirm the Claims Court's determination that claimants have failed to establish a viable cause of action under any of these (or other) authorities.

1

We begin with the 1863 Acts. The full text of Section 9 of the February Act provides:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre of said Indians. The land so set apart shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 652, 654.

Although repackaged in several proposed causes of action, claimants make two basic claims under this provision, separately premised on each of its two sentences. First, they argue that the opening sentence, which authorizes the Secretary to set aside 80 acres of land to each loyal Sioux, imposed a duty to set aside such lands—a duty that the Secretary breached by not doing so. Second, and in tension with the first point, claimants contend that certain actions taken in 1865 actually did set aside land for the loyal Sioux under the statute, thereby giving rise to the more concrete rights specified in the provision's second sentence. We conclude that claimants have failed to establish the viability of either claim.[2]

---

[2] Apart from claims to damages, claimants also seek affirmative relief under 28 U.S.C. § 1491(a)(2) related to the land that they believe they are owed under the Acts. Putting aside what our analysis of the Act may imply about the merits of that contention, it fails because relief under subsection (a)(2) must be "an incident of and

The analysis of the first sentence's declaration that the Secretary "is hereby authorized to set apart" parcels of land for the loyal Sioux is straightforward. That declaration is simply too discretionary to support a viable claim for damages on its own. *See Wolfchild*, 101 Fed. Cl. at 70-73. We have long recognized that statutes granting officials "substantial discretion" are "not considered money-mandating," *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed. Cir. 2012), and this provision fits squarely within that rule. It does not impose any duty on the Secretary to make the land grants that it authorizes. It therefore cannot "'fairly be interpreted as mandating compensation for damages sustained'" from a failure to provide such lands. *Navajo II*, 556 U.S. at 291.[3]

Claimants fare no better in their attempt to make out a claim based on the more absolute rights set forth in the statute's second sentence. Because those rights attach only to land that was "set apart" under the authority granted in the provision's first sentence, any such claim must be premised on affirmative actions taken under that authority. Act of Feb. 16, 1863, § 9, 12 Stat. at 654. Claimants contend that the Secretary did in fact take the necessary steps to set apart land under the Act, focusing our attention on certain events in 1865. Specifically, they contend that the Secretary identified 12 sections of land

---

collateral to" any damages judgment, so that this contention falls with the damages claims.

[3]     Neither claimant group seems to have argued to this court that the March 1863 Act independently creates an applicable money-mandating duty, but the same analysis would apply. Providing that it "shall be lawful" for the Secretary to locate loyal Sioux on certain lands, Act of Mar. 3, 1863, ch. 119, § 4, 12 Stat. 819, is just another way of saying that the Secretary is authorized to do so.

for the loyal Sioux and withdrew them from public sale, which sufficiently "set apart" those lands to make the section's second sentence applicable.

Those 1865 actions, however, cannot support a timely claim for relief, regardless of whether they could qualify as having "set apart" land under the Act. After it took the steps toward conveyance of the 12 sections to the designated Indians in 1865, the government terminated the process and sold the parcels to others. Claimants have not alleged error in the Claims Court's finding that all of the 12 sections were sold no later than 1895, which was apparently not disputed by any claimants in the Claims Court. *See Wolfchild*, 101 Fed. Cl. at 74. The six-year statute of limitations, therefore, has long since run.

Because claimants cannot state a claim under either sentence of Section 9 of the February 1863 Act, we affirm the Claims Court's conclusion that claimants "lack any claim grounded in the 1863 Acts." *Wolfchild*, 101 Fed. Cl. at 76.[4]

2

In addition to the claims brought directly under the 1863 Acts, some claimants also ask us to recognize a separate claim based on an alleged violation of rights granted in the 1851 and 1858 treaties. We decline to do so. First, it does not appear that claimants asserted an independent, treaty-based claim in the Claims Court. That court never addressed a separate cause of action for treaty rights in either of its extensive decisions, and claimants have not pointed to any proposed complaint

---

[4] Based on statements in our 2009 opinion, *Wolfchild*, 559 F.3d at 1232, 1241, the parties and the Claims Court have disputed whether the March 1863 Act superseded Section 9 of the February 1863 Act. We find it unnecessary to resolve that dispute.

attached to a motion to amend in which such a claim was asserted. The claim is therefore waived. *E.g.*, *San Carlos Apache Tribe*, 639 F.3d at 1354-55.

In any event, claimants have not shown that any perceived third-party rights arising under the treaties survived the February 1863 Act. (Claimants seek to obtain property they say should have been, but was never, granted under the treaties; their claim does not concern property that was granted in fee under the treaties before the annulment, with vesting of rights then secured by state or other non-treaty law.) The February 1863 Act is categorical in pronouncing that "all treaties" entered into with the Minnesota Sioux "are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States," before going on to declare that "all lands and rights of occupancy" in Minnesota and "all annuities and claims heretofore accorded to said Indians" are "forfeited." Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. The provision makes no exemption for the loyal Sioux or any other individual Indians.

Claimants nevertheless contend that their claims survived the annulment. Their theory appears to be that, because Section 9 of the February 1863 Act was intended to provide the loyal Sioux a substitute for lost treaty rights and was not implemented, they may turn instead to the treaties as a source of actionable rights. But the annulment of the treaties was not conditional on Section 9, including any discretionary acts authorized by Section 9, and claimants must therefore assert rights under the statute, not the treaties. We can find no basis to hold that the asserted third-party treaty rights survived the February 1863 Act.

3

The final source of proposed claims that we address is the Indian Non-Intercourse Act (INIA), which provides

that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. Claimants invoke this statute in support of two sets of claims: (1) "land" claims alleging that the government improperly sold lands to which claimants were entitled under the 1851 and 1858 treaties and the 1863 Acts and improperly transferred land to the three communities that had been purchased for claimants under the 1888-1890 Acts and the 1934 IRA; and (2) "fund" claims alleging that INIA coverage imposes a fiduciary duty on the United States that requires disbursement of revenues to claimants rather than the three communities. We conclude that, even if the INIA imposes a money-mandating duty on the United States (which we need not decide), none of these theories supports a viable claim under the statute.[5]

First, it does not appear that there is anything left to sustain an INIA claim once the assertions of property rights under the 1888-1890 Acts, the 1863 Acts, and the 1851 and 1858 treaties are rejected. The INIA prohibits the improper disposition of Indian lands, which necessarily presumes that the complaining party holds "lands, or . . . any title or claim thereto." 25 U.S.C. § 177. Without a

---

[5] To the extent that the claim to "funds" earned from the land rests in part on other authorities, our conclusion does not change. The 1888-1890 Acts and the 1863 Acts cannot support such a claim for the same reasons set forth in sections A.1 and B.1, *supra*. Nor do claimants have a viable claim to any revenue produced on the additional land purchased for the three communities under the IRA, because, as they acknowledge, the government bought that land and took it into trust for the three communities from the outset.

source of extant property rights in any lands, claimants no longer have a basis for alleging this essential prerequisite to claiming an actionable conveyance under the INIA.

Second, even if claimants could identify a relevant property right, there is no sufficient basis for finding that claimants constitute a "tribe" within the meaning of the INIA. Specifically, claimants, whose defining characteristic is descent from Indians that broke their original tribal relations, have not shown error in the Claims Court's conclusion that, at all relevant times, they have lacked the unitary organization required to be a tribe. *See Wolfchild*, 101 Fed. Cl. at 65-69. Claimants attempt to overcome the court's finding by relying centrally on the contention that the beneficiaries of pre-1980 "reservation" lands qualify as a tribe. They point to those reservations as proof, for example, that the Indians occupied a sufficiently defined territory and had the requisite, unified political structure. But those arguments cannot help the claimants here because, even if the class of beneficiaries of the pre-1980 "reservation" lands qualified as one or more than one tribe under the INIA, that class simply is not coincident—though it overlaps—with the class of claimants in this case. Indeed, that is the whole reason for this lawsuit—the three communities that occupied and benefited from the pre-1980 reservations are not identical to this group of claimants. Accordingly, these claimants cannot look to those reservations in order to support a finding that they are a tribe under the INIA. We consequently affirm the Claims Court's judgment on these claims.

## CONCLUSION

When this case began, it was more narrowly focused: claimants had one principal theory. Having lost on that theory in 2009, claimants developed a number of alternative theories rooted in a variety of authorities. We now conclude that none of the new theories breathes life into

this case because none supports an actionable claim for relief under governing law. We therefore reverse the Claims Court's judgment against the United States on the claim to pre-1980 money and affirm its judgment against claimants on the remainder of the proposed claims.

COSTS

No costs.

**AFFIRMED IN PART, REVERSED IN PART**

# United States Court of Appeals
## for the Federal Circuit

_____

**SHELDON PETERS WOLFCHILD, ERNIE PETERS LONGWALKER, SCOTT ADOLPHSON, MORRIS J. PENDLETON, BARBARA FEEZOR BUTTES, WINIFRED ST. PIERRE FEEZOR, AUTUMN WEAVER, ARIES BLUESTONE WEAVER, ELIJAH BLUESTONE WEAVER, RUBY MINKEL, LAVONNE A. SWENSON, WILLIS SWENSON, AARON SWENSON, BEVERLY M. SCOTT, LILLIAN WILSON, MONIQUE WILSON, SANDRA COLUMBUS GESHICK, CHERYL K. LORUSSO, JENNIFER K. LORUSSO, CASSANDRA SHEVCHUK, JASON SHEVCHUK, JAMES PAUL WILSON, EVA GRACE WILSON, BENITA M. JOHNSON, AND KEVIN LORUSSO**,
*Plaintiffs-Cross Appellants,*

AND

**ANITA D. WHIPPLE et al., Descendants of Lucy Trudell, BONNIE RAE LOWE, et al., Descendants of Joseph Graham, et al., LENOR ANN SCHEFFLER BLAESER et al., Descendants of John Moose, AND MARY BETH LAFFERTY, et al.,**
*Plaintiffs,*

AND

**COURSOLLE DESCENDANTS AND ROCQUE AND TAYLOR DESCENDANTS,**
*Plaintiffs,*

**AND**


**DEBORAH L. SAUL, LAURA VASSAR, et al., LYDIA FERRIS et al., DANIEL M TRUDELL, et al., ROBERT LEE TAYLOR, et al., AND DAWN HENRY,**
*Plaintiffs,*


**AND**


**RAYMOND CERMAK, SR., (acting individually and under a power of attorney for Stanley F. Cermak, Sr.), MICHAEL STEPHENS, et al., JESSE CERMAK, et al., DENISE HENDERSON, DELORES KLINGBERG, SALLY ELLA ALKIRE, PIERRE ARNOLD, JR., AND GETRUDE GODOY et al.,**
*Plaintiffs,*


**AND**


**JOHN DOES 1-30, WINONA C. THOMAS ENYARD, AND KITTO, et al.,**
*Plaintiffs,*


**AND**


**FRANCINE GARREAU, et al.,**
*Plaintiffs,*


**AND**


**FRANCIS ELAINE FELIX,**
*Plaintiff,*


**AND**


**KE ZEPHIER, et al.,**
*Plaintiffs,*

**AND**

**LOWER SIOUX INDIAN COMMUNITY,**
*Plaintiff,*

**AND**

**PHILIP W. MORGAN**,
*Plaintiff,*

**AND**

**REBECCA ELIZABETH FELIX**,
*Plaintiff,*

**AND**

**VERA A. ROONEY, et al.,**
*Plaintiffs,*

**AND**

**DANNY LEE MOZAK,**
*Plaintiff-Cross Appellant,*

**AND**

**DAWN BURLEY, et al.**
*Plaintiffs-Cross Appellants,*

**AND**

**HARLEY ZEPHIER, SR.,**
*Plaintiff-Cross Appellant,*

**AND**

**JOHN DOES 1-433,**
*Plaintiffs-Cross Appellants,*

AND

**JULIA DUMARCE, et al.,**
*Plaintiffs-Cross Appellants,*

AND

**RAYMOND COURNOYER, SR., et al., JERRY ROBINETTE, et al., SANDRA KIMBELL, et al., CHARLENE WANNA, et al.,** AND **LESLIE LEE FRENCH, et al.,**
*Plaintiffs-Cross Appellants,*

AND

**KRISTINE ABRAHAMSON,**
*Plaintiff-Cross-Appellant,*

AND

**VICTORIA ROBERTSON VADNAIS,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

———————————

2012-5035, -5036, -5043

———————————

Appeals from the United States Court of Federal Claims in consolidated case nos. 03-CV-2684 and 01-CV-0568, Judge Charles F. Lettow.

R EYNA, *Circuit Judge*, concurring-in-part and dissenting-in-part.

This case is ingrained in the intertwined, inextricable relationship between the American Indian and the United States. The question we are called to resolve is whether promises made to a small group of American Indians created obligations on the part of the United States that remain in effect. The majority looks primarily at the law and determines that the United States created no such obligations. I look at the both history and the law and find that the United States made certain promises of compensation that were memorialized by Congress in laws that it passed with the specific intent to create binding obligations to compensate the small band of American Indians. Because I believe those obligations remain in effect and provide a jurisdictional basis for appellants' lawsuit against the United States, I respectfully dissent. I concur with the majority on the remaining issues.

## I.   H ISTORICAL B ACKGROUND

The majority glosses over key historical circumstances that are critical to interpret the 1888-1890 Appropriations Acts. My review begins and ends with those historical circumstances.

### A.   Broken Treaties and the Sioux Uprising

On September 29, 1837, the Sioux and the United States entered into a treaty whereby the Sioux agreed to cede to the United States all of their lands east of the Mississippi. In consideration, the United States' agreed that it would invest $300,000 for the benefit of the Sioux. Under the Treaty, the United States was required to pay an annuity to the Sioux "forever." *Wolfchild v. United States*, 96 Fed. Cl. 302, 312 (Fed. Cl. 2010) ("*Claims Court*

*Remand Decision*") (quoting Treaty of Sept. 29, 1837, arts. I–II, 7 Stat. 538). Thereafter, in subsequent treaties, the Sioux ceded lands in the territories of Minnesota and Iowa in exchange for the United States' promise of "perpetual" peace and friendship. *Id.* (quoting Treaty of Aug. 5, 1851, arts. I–II, 10 Stat. 954 and Treaty of July 23, 1851, arts. II–IV, 10 Stat. 949).

As relevant for our purposes, the Mdewakanton band was among the Sioux that entered into the treaties with the United States. By 1858, the Mdewakanton had agreed to occupy a reservation along the Minnesota River in south-central Minnesota. *Id.* (quoting Treaty of June 19, 1858, arts. I–III, 12 Stat. 1031).

In 1862, the Sioux revolted after the United States failed to furnish promised money and supplies under the terms of the treaties. The uprising resulted in the death of more than 500 white settlers and substantial property damage. Among other things, the United States viewed the revolt as a breach by the Sioux of the agreement to remain peaceful with the United States.

But not all Sioux broke the pledge to remain peaceful. Some of the Sioux, in particular a small number of the Mdewakanton (the "Loyal Mdewakanton"), actively defended white settlers and were later credited as having saved white settlers' lives.[1] The record is undisputed that

---

[1] The Mdewakanton are known as a band of Minnesota Sioux. I refer to them as the "Loyal Mdewakanton" in recognition of their choice to sever their tribal relationship during the Sioux uprising and remain loyal to the United States by either not participating in the revolt or taking affirmative actions to save the white settlers on the Minnesota frontier. *See Wolfchild v. United States*, 101 Fed. Cl. 54, 59-60 (Fed. Cl. 2011). The plaintiffs, referred to herein as "the Wolfchild plaintiffs," are approximately 20,750 lineal descendants of the Loyal

at the risk of their own safety, the Loyal Mdewakanton prevented greater bloodshed and property damage. But the courageous acts of the Loyal Mdewakanton came with a price. Siding with the white settlers meant breaking away and severing ties with the Sioux tribe, including the Mdewakanton band.

In response to the Sioux uprising, the United States annulled its treaties with the Sioux, confiscated Sioux lands in Minnesota, and moved the Sioux west, outside the limits of then existing states. As for the Loyal Mdewakanton, their lands were confiscated along with all the other Sioux lands in Minnesota, and their annuity valued at approximately $1,000,000 was terminated. In addition, the Loyal Mdewakanton "could not return to their tribe . . . or they would be slaughtered for the part they took in the outbreak." *Claims Court Remand Decision*, 96 Fed. Cl. at 313 (quoting Cong. Globe, 38th Cong., 1st Sess. 3516 (1864)). As a result, the Loyal Mdewakanton were left isolated, poverty-stricken and homeless.

## B. Congressional Efforts to Compensate the Loyal Mdewakanton

In 1863, Congress took its first action intended to compensate and reward the Loyal Mdewakanton for their loyalty during the Sioux uprising by enacting a statute that provided public lands to serve as "an inheritance to said Indians and their heirs forever." Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. 652, 654. Two weeks later, Congress passed a second statute that authorized the President to set apart agricultural lands for the Sioux who exerted themselves in rescuing the whites from massacre. *See* Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819. White settlers refused to permit any Sioux from

---

Mdewakanton. *Claims Court Remand Decision*, 96 Fed. Cl. at 310.

resettling in Minnesota and became opposed the authorized land purchases.  The two 1863 acts were never repealed, yet the Loyal Mdewakanton never realized the land benefits conferred under those acts.

In 1886, after conducting a census to establish which individuals had remained loyal to the United States during the Sioux uprising, Congress again attempted to provide the Loyal Mdewakanton with viable long-term relief.  Congress enacted Appropriations Acts in 1888, 1889 and 1890 that included specific provisions for land proceeds to benefit the Loyal Mdewakanton.  In particular, the 1888-1890 Appropriations Acts memorialized Congress's renewed efforts to provide relief to the destitute Loyal Mdewakanton.

*   *   *

In 1888, Congress appropriated $20,000 for the Department of the Interior ("Interior") to purchase land, cattle, horses, and agricultural implements for the "fullblood" Loyal Mdewakanton.  Act of June 29, 1888, ch. 503, 25 Stat. 217, 228−29 ("1888 Act").  In 1889, Congress appropriated an additional $12,000 for the Loyal Mdewakanton.  It also enacted a second Act that was substantially similar to the 1888 Act, but additionally required the Secretary of the Interior to expend the money equally among the Loyal Mdewakanton and mandated that any money not expended in one fiscal year be expended in a future fiscal year.   Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992−93 ("1889 Act").

The 1889 Act, like the 1888 Act, indicated that the appropriated funds should be used for the benefit of the Loyal Mdewakanton.  *Id.*  More specifically, the 1889 Act used the imperative word "shall" to establish Interior's duty with respect to specific appropriations and the Loyal Mdewakanton's right to the money set aside for "lands, cattle, horses, implements, seeds, food, or clothing."  *Id*. The Act also established specific accounting procedures

and eligibility requirements for the expenditure of funds. The 1889 Act reads in relevant part:

> For the *support* of the full-blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, twelve thousand dollars, to be expended by the Secretary of the Interior . . . Provided, That if the amount in this paragraph appropriated, or any portion of the sum appropriated for the benefit of these same Indians by said act of June twenty-ninth, eighteen hundred and eighty-eight, *shall* not be expended within the fiscal year for which either sum was appropriated, neither *shall* be covered into the Treasury, but *shall*, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and *for the benefit of the above-named Indians*: And provided also, That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing *shall be so expended* that each of the Indians in this paragraph mentioned *shall receive*, as nearly as practicable an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: And provided further, That as far as practicable lands for said Indians *shall* be purchased in such locality as each Indian desires, and none of said Indians *shall* be required to remove from where he now resides and to any locality against his will.

*Id.* (emphases added).

The Act enacted in 1890, appropriating $8,000, is substantially similar to the earlier Acts, but also recognizes that the designated funds are for the support of full and mixed blood Loyal Mdewakanton who have "severed their tribal relations," and as such "shall receive" the appropriated funds in as close to "an equal amount" as practicable. Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 ("1890 Act").

Interior used the appropriated funds to purchase lands in three distinct areas of Minnesota. As the majority notes, in the years that followed, these three parcels of land developed into the three distinct communities of the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Community ("the three communities"). The United States now holds the lands in trust for the three communities, to which many descendants of the Loyal Mdewakanton do not belong.

## II. THE PREVIOUS FEDERAL CIRCUIT PANEL DECISION

A panel of this Court previously held that the funds appropriated under the Appropriations Acts are subject to statutory use restrictions and did not create a trust or convey ownership rights in the lands purchased with those funds. *See Wolfchild v. United States*, 559 F.3d 1228, 1255 (Fed. Cir. 2009) ("*Wolfchild I*"). The panel, however, did not address the money-mandating issue before us today. Specifically, the *Wolfchild I* panel explicitly declined to address whether it was lawful for Interior to transfer to the three communities the funds derived from the Mdewakanton lands:

> The parties devote some attention to the question whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in

> funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds. *See Wolfchild I*, 62 Fed.Cl. at 549−50. That issue *does not affect our analysis* of the two certified questions, however, and *we leave that issue to be addressed, to the extent necessary, in further proceedings before the trial court.*

*Wolfchild I*, 559 F.3d at 1259 n.14 (emphases added). On remand, consistent with the guidance of this Court, the Wolfchild plaintiffs amended their complaint to assert that the statutory use restrictions vested the class of plaintiffs with rights to pre-1980 revenues derived from the lands purchased for the benefit of the Loyal Mdewakanton.

The majority holds that the decision in *Wolfchild I* decided and foreclosed the issue presented to us in this case. *See* Maj. Op. 15. I disagree. It is clear to me that the *Wolfchild I* panel explicitly decided not to reach the issue that is before us today and, indeed, cleared the way for the plaintiffs to amend the complaint to raise the issue. *Wolfchild I*, 559 F.3d at 1259 n.14.

### III. ANALYSIS OF MONEY-MANDATING DUTY

#### A. The Indian Tucker Act

The majority interprets the 1888-1890 Appropriations Acts as conferring the Secretary of the Interior with discretion on how to distribute the pre-1980 revenues derived from appropriated lands, a discretion that frees the United States from its promise to compensate the Loyal Mdewakanton and their descendants. *See* Maj. Op. 14-15. In my view, the text of the Acts, purpose of the Acts, and judicial recognition of the relationship between the government and the Tribes support the conclusion that the Acts "can be fairly interpreted" or are "reasona-

bly amenable" to the interpretation that they mandate compensation by the government. *See United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (citations omitted); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003) (clarifying that "a fair inference will do"). Here, there exists more than a fair inference that the 1888-1890 Acts impose a money-mandating duty on the government.

### 1.    Plain Reading of the Appropriations Acts

I disagree that the Appropriations Acts' grant of *authority* to the Secretary to generate leasing revenues cannot support a fair inference that, once revenues are generated, the Secretary had a *duty* to spend those revenues for the benefit of the Loyal Mdewakanton. *See* Maj. Op. at 15. In my view, because the lands were purchased for the benefit of the Loyal Mdewakanton, any revenues generated from those lands necessarily belonged to the Loyal Mdewakanton.

Jurisdiction under the Indian Tucker Act is not limited to statutory schemes that leave the government "no discretion over payment of claimed funds." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). Certain discretionary schemes may support claims if they provide clear standards for paying money to recipients. *Id.* (citations omitted). Here, the Appropriations Acts provide clear standards by directing the Secretary to spend the appropriated funds in a way such that each of the Loyal Mdewakanton (who "have severed their tribal relations") receives "an equal amount in value." 1889 Act, 25 Stat. at 993; 1890 Act, 26 Stat at 349. The Acts also provide that, to the extent the appropriations were spent on land, the land "shall be purchased in such locality as each Indian desires." *Id.*

Congress's use of the word "shall" invokes a presumption that the provision is money mandating. *See Greenlee County, Ariz. v. U.S.*, 487 F.3d 871, 877 (Fed. Cir. 2007)

(citations omitted). The majority ignores that the Appropriations Acts repeatedly use the word "shall" to convey, for example, that the funds "shall be so expended" for the benefit of the Loyal Mdewakanton, and that the recipients "shall receive" the funds in "equal amount[s]." *See* 25 Stat. at 992-93. This drafting choice implies that once certain condition precedents are met, the Secretary is expected to adhere to Congress's directive. *See Doe v. U.S.*, 463 F.3d 1314, 1325 (Fed. Cir. 2006) (finding the source of law money-mandating where the statute used "shall").

The majority concludes that the use restrictions do not extend to land revenues by equating the result to a trust, and that the *Wolfchild I* panel held the 1888-1890 Appropriations Acts did not create such a trust. *See* Maj. Op. at 15; *Wolfchild I*, 559 F.3d at 1255. I agree with the Claims Court that our previous decision cannot be read to foreclose the issue of whether the use restrictions, without being considered a trust, can serve as the basis for a legitimate claim by the plaintiffs, particularly in view of the previous panel's explicit warning that it was not deciding the issue. *Claims Court Remand Decision*, 96 Fed. Cl. at 328; *Wolfchild I*, 559 F.3d at 1259. "Only the issues actually decided—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) (citations omitted). Again, to be clear, the panel in *Wolfchild I* neither decided the issue of the applicability of the use restrictions to pre-1980 proceeds, nor foreclosed the issue, but expressly reserved it for consideration in later litigation involving the same parties.

Because the language of the Acts obligates the government to act for the benefit of the Loyal Mdewakanton, and the Wolfchild plaintiffs have alleged facts showing that the government failed to act on behalf of the Loyal

Mdewakanton, I would affirm the Claim Court's conclusion that the amended complaint states a viable claim for damages based on the statutory use restrictions on pre-1980 funds.[2]

## 2.  Historical Context of the Appropriations Acts

The historical context of the 1888-1890 Appropriations Acts is useful in understanding the government's obligations to the Loyal Mdewakanton.  My review of the legislative history, internal memoranda reflecting Interior's contemporaneous policy choices, and interpretive canons favoring protection for Native American claimants leads me to conclude that Congress intended the Appropriations Acts to provide a money-mandating duty.  Where, as here, we have historical tools that illuminate Congress's true intent in alleviating the plight of a displaced Tribal group, we should interpret the statutes taking into account the structure and underlying values of the scheme at the time it was enacted.  *See, e.g., Steelworkers v. Weber*, 443 U.S. 193, 201 (1979) (holding that the statute prohibiting racial discrimination must "be read against the background of the legislative history of Title VII and the historical context from which the Act arose"); *District of Columbia v. Heller*, 554 U.S. 570, 599−600 (2008) (cautioning against ignoring the historical realities surrounding the right to bear arms at the time the Second Amendment was codified as a right).

First, the legislative history confirms that the over-arching purpose of the 1888-1890 Appropriations Acts

---

[2]    In 1980, Congress enacted legislation declaring that the United States would thereafter hold the lands in trust for the three communities.  Act of Dec. 19, 1980, Pub. L. No. 96-557, § 1, 94 Stat 3262 ("1980 Act").  There is nothing in the text or legislative history of the 1980 Act that repeals or otherwise overcomes the duty imposed on the United States by the 1888-1890 Appropriations Acts.

was to set aside resources that honor the sacrifices of the Loyal Mdewakanton following the Sioux uprising.   For example, in 1888, 1889, and 1890, the proposed legislation was placed under the heading of "Fulfilling Treaty Stipulations with and Support of Indian Tribes," rather than a more general "Miscellaneous" or "Miscellaneous Supports" heading.  *See Claims Court Remand Decision*, 96 Fed. Cl. at 340 (citing 25 Stat. at 219; 25 Stat. at 982; 26 Stat. at 338).   The Loyal Mdewakanton and their descendants were afforded a specific set of rights that constituted "replacements" for the "annuities and other benefits" the government had not delivered even after the Loyal Mdewakanton maintained their treaty obligations through a period of acute violence.  *See id.* (recognizing the Appropriations Acts as "a substitution for the treaty benefits of which the Loyal Mdewakanton had been deprived.").

Contemporaneous comments reveal that during the 1860s the Minnesota frontier had been so ablaze with negative sentiment following the Sioux uprising that no Tribal group—not even the steadfastly loyal—would collect their share of promised annuity funds.[3]  Senator MacDonald, the sponsor of the 1888 Appropriation Act, aptly explained Congress's intent in passing the Acts:

> [A] few of . . . [the Sioux] remained friendly to the whites and became their trusted allies and defenders, and . . .  a number of them did valuable

---

[3]    For example, in 1862, the Governor of Minnesota, gave a speech to the State Legislature calling for the extermination or total displacement of the Sioux.   J.A. 3453 ("The Sioux Indians of Minnesota must be exterminated or driven forever beyond the borders of the State."); see also J.A. 2387−88 (A New York Times editorial describing the scalping of "red devils" as a "state right" in Minnesota).

service in protecting our people and their proper-
ty, and in saving many lives . . . .   They have ever
since had claims upon not only our gratitude but
that of the nation at large, which ought long ago
to have been recognized and partially, at least,
compensated for their invaluable services . . .   I
am almost ashamed to say it, but the fact is that
no exception [to the Act of Feb. 16, 1863] was
made, even in favor of these friendly Indians.

*Claims Court Remand Decision*, 96 Fed. Cl. at 340−41
(quoting 19 Cong. Rec. 2,976−77 (1888)). Senator Mac-
Donald's statement of the bill's purpose confirms that
Congress passed the 1888-1890 Appropriations Acts
because the rights of the Loyal Mdewakanton were ab-
ruptly annulled and subsequent legislative efforts to
remedy their misfortune were inadequate.

Second, the determination that the 1888-1890 Ap-
propriations Acts are not money-mandating is contrary to
the government's own time-worn understanding that the
land-use restrictions obliged the government to spend
land proceeds for the benefit of the Loyal Mdewakanton.
As the Claims Court pointed out, for the last 90 years,
Interior has understood that if it were to assign the
benefits of the lands to other Indians, there would be
monetary repercussions for its breach in duties.  *See
Claims Court Remand Decision*, 96 Fed. Cl. at 341−42,
348.

For example, in 1933, Interior recognized that the
land on which the three communities were situated "was
land purchased for the Mdewakanton Sioux . . . *and their
descendants.  It has been and can be assigned only to such
persons.*"  *Id.* at 344 (quoting Mem. From Charlotte T.
Westwood to Joe Jennings, Indian Reorganization (ap-

proximately dated Nov. 27, 1933)) (emphasis added).[4] Also, in 1950, an attorney for Interior confirmed that the 1888-1890 Appropriations Acts excluded other Indian groups from monetary proceeds flowing from the restricted land:

> In view of the provisions of the [Appropriations] Acts. . . [the 1886 lands] may be assigned only to members of the Mdewakanton Band of Sioux Indians residing in Minnesota, and such assignee must have been a resident of Minnesota on May 20, 1886, or be a legal descendant of such resident Indian.

*Claims Court Remand Decision*, 96 Fed. Cl. at 344 (citing Mem. by Rex H. Barnes (July 24, 1950)); *see also* Mem. from Daniel S. Boos (Mar. 17, 1969) ("Based on independent research I have concluded that these remarks [the statements in the Barnes 1950 memorandum regarding the lineal descendants' entitlement] are correct.").

---

[4] Interior's recognition of its duty to the descendants of the Mdewakanton Sioux undermines the majority's contention that any duty to the Loyal Mdewakanton created by statute need not extend to future generations. Maj. Op. 14 (concluding that the duty would only extend to future generations if Congress included the word "descendants"). Moreover, the language in the land use certificates granting "heirs" of the assignee "exclusive use and possession of said land" is in perfect alignment with the first 1863 Act instructing that the designated land should "be an inheritance to said Indians and their heirs *forever*." Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The land use certificates are also consistent with the actual language of the Appropriations Acts, reciting that "families" of the named Loyal Mdewakanton qualified as beneficiaries. 1889 Act, 25 Stat. at 992-93; 1890 Act, 26 Stat. at 349.

But the most telling statement—the one promulgated by Interior most recently—is a 1970 opinion by the Assistant Solicitor for Indian Legal Activities, who advised that the distributions that the government later made to the three communities would be unlawful:

> [T]he land in question remains available only for the use of qualified Mdewakanton Sioux Indians. If it appears desirable to use the land by assigning it to or for the benefit of other Indians, we suggest that Congress should be asked to permit such action by affirmative legislation. We know of no means of accomplishing this by administrative action, particularly over any objections of eligible Mdewakanton Sioux Indians.

*Claims Court Remand Decision*, 96 Fed. Cl. at 344 (citing Mem. by Charles M. Soller (Dec. 4, 1970)). In the 1970 memorandum, Interior considers whether the land-use restrictions can be set aside, and offers that the Loyal Mdewakanton are the proper beneficiaries of the land unless Congress acts through legislation. This conclusion of existing binding obligations created by the use restrictions further supports interpreting the use restrictions in the 1888-1890 Appropriations Acts as imposing a money-mandating duty on revenues derived from land purchases.

### 3. The Special Relationship Between the Government and the Tribes

In my view, recognizing a money-mandating duty in favor of the Loyal Mdewakanton is further commanded by the special relationship between the United States and the Tribes, as well as by the application of canons of statutory interpretation that resolve language disputes in favor of Tribal groups who, having endured a history of rampant injustice, deserve the fullest protection under the law. *See U.S. v. Sioux Nation of Indians*, 448 U.S. 371, 423 (1980) (supporting the Claims Court's analysis

that the 1877 Act embodied an implied obligation of the government to compensate a taking of tribal property set aside for the exclusive use of the Sioux). The Supreme Court recognizes that the relationship between the United States and the Indian people is distinctive, "different from that existing between individuals whether dealing at arm's length, as trustees and beneficiaries, or otherwise." *U.S. v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323 (2011) (quoting *Klamath and Moadoc Tribes v. United States*, 296 U.S. 244, 254 (1935)); *see also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.) (explaining that Indians' "relation to the United States resembles that of a ward to his guardian"). "Few conquered people in the history of mankind have paid so dearly for their defense of a way of life." *Sioux Nation of Indians*, 448 U.S. at 423 (quoting R. Billington, Introduction, *in* SOLDIER AND BRAVE xiv (1963)).

I submit that the government's unique relationship with the Indian people obligates it to strictly honor the land-use restrictions in the 1888-1890 Appropriations Acts. *See Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 699 F.3d 1289, 1298 (Fed. Cir. 2012) (citing *United States v. Mitchell*, 463 U.S. 206, 225 (1983)). My view is supported by the entrenched expectation that "statutes passed for the benefit of dependent Indian tribes. . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775, 795 (1991) (internal citations omitted*); Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). This canon of construction, dating back to the earliest years of our Nation's history, is rooted in the unique relationship between the federal government and the Indians, with the understanding that Indians did not wield equal bargaining power when earlier Treaties were negotiated and, as a consequence, doubtful statutory expressions should be resolved in their favor. *See Hagen v. Utah*, 510 U.S. 399, 423 n.1 (collect-

ing cases). With these principles in mind, there is not just a "fair" inference that the 1888-1890 Appropriations Acts are money-mandating, but rather, an unassailable certainty that they are so. The majority resists this conclusion and demands "a more explicit direction from Congress," fearing that a viable claim under the Acts would impose "a tremendous burden" on Interior given the number of Loyal Mdewakanton and their varied geographic locations. *See* Maj. Op. at 15-16.[5] The standard to establish a waiver under the Indian Tucker Act, however, is not made higher when the case presents "pragmatic considerations." *Id.* The Wolfchild plaintiffs only needed to establish, and did establish, that the 1888-1890 Acts can be fairly interpreted to impose a duty on the United States. *See White Mountain,* 537 U.S. at 480; *Samish,* 419 F.3d at 1365.

## B. Statute of Limitations

Because I read the claims adjudicated today as falling within the terms of Indian Trust Accounting Statute, the general six-year statute of limitations period would not apply. *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1346–47 (Fed. Cir. 2004). I affirm the view of the Claims Court that the statute of limitations did not commence to run on the Wolfchild plaintiffs' claims until there was an accounting under

---

[5]   While it may be true that resolution of this case may raise administrative burdens, such burdens should not relieve the government from its own treaty obligations, especially given that the burden has been made more difficult due to the passing of time, a circumstance that the government created and had the power to avoid. It is not in this Court's province to avoid an otherwise just and correct judgment on the grounds that its implementation would impose an administrative burden on the government.

which the beneficiary could determine whether there has been a loss. *Claims Court Remand Decision*, 96 Fed. Cl. at 335. For the reasons stated in the Claims Court's opinion, I depart from the majority and would affirm the conclusion that the Wolfchild plaintiffs' pursuit of money damages for pre-1980 revenues derived from appropriated lands was timely.

## IV. CONCLUSION

The plain meaning of the statutes, the historical context of the 1888-1890 Appropriations Acts, and the special relationship between the government and the Tribes all weigh against the majority's conclusion that the Appropriations Acts do not give rise to a money-mandating duty. In denying legitimate claims for compensation under the Indian Tucker Act, the majority loses sight of what the statutes were intended to accomplish at the time of their enactment. For the reasons stated above, I would affirm the Claims Court in finding that the Wolfchild plaintiffs are entitled to litigate and seek judgment against the government for the improper allocation of land revenues set aside for their benefit. Accordingly, I respectfully dissent-in-part.